### Carolyn Osborne ROSS

v.

### William H. MATHIS, et al.

### Civ. A. No. C–84–1309–A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 11, 1985.

John C. Gray, Atlanta, Ga., for plaintiff.

Paul W. Stivers, Atlanta, Ga., for defendants.

## ORDER

O'KELLEY, District Judge.

Presently pending is defendants' motion for arbitration and to stay this action pend-

ing arbitration. The court held a hearing on the matter on August 7, 1985. Upon review, the court grants defendants' motion.

Plaintiff Carolyn Ross brings this action against defendants William H. Mathis and Bear Stearns and Company claiming violations of the Securities Exchange Act of 1934 (the 1934 Act), 15 U.S.C. §§ 78a, *et seq.*, Rule 10b–5, 17 C.F.R. § 240.10b–5; the Racketeer Influenced and Corrupt Organizations Act, (RICO), 18 U.S.C. §§ 1961 *et seq.*, and also for breach of fiduciary duty and contract, and negligence. The facts as Ross alleges them in her complaint are as follows. She was a very rich widow when she met Mathis, a stockbroker with Bear Stearns. The two developed "a close and trusting relationship," (Complaint at 8), and apparently were romantically involved. Ross moved to Atlanta from Birmingham, Alabama to be with Mathis. Their relationship continued until late 1978 or early 1979. They remained friends until 1984.

Soon after their relationship began, they discussed ways to invest Ross' inheritance, approximately $1,000,000.00. Ross allegedly informed Mathis that she wanted safe investments to produce a steady income. Mathis assured Ross that if she entrusted the money to him, he would invest it so that she would receive $5,000 per month for life. He also stated that most of her money would be placed in long-term municipal bonds. In reliance on his statements, Ross put approximately $900,000.00 into a trading account with Bear Stearns to be managed by Mathis. She also opened a discretionary stock account which authorized Mathis to act in Ross' behalf. Mathis told Ross that she need not read her statements and that he would keep her informed.

Initially, Mathis invested Ross' money in municipal bonds and made some small speculative investments which did not involve much risk. Later, however, Mathis began to violate Ross' expressed investment goals, by *inter alia* investing large amounts into highly speculative investments without informing her, selling her municipal bonds to finance these purchases and keep a steady cash flow, and by trading excessively. Ross was unaware of this because she followed Mathis' instructions not to open the statements, and believed his continuing representations. In August, 1983, Ross became aware of problems with the account. In October, 1983, she received a margin notice from Bear Stearns about her problems. She phoned Mathis, who was unresponsive, although at first he expressed concern. Ross finally closed her account and transferred it to a different broker. Currently, it is valued at $90,-000.00.

Defendants denied Ross' allegations and filed a motion to sever and stay and a demand for arbitration. Ross opposed this motion. After the United States Supreme Court's decision in *Dean Witter Reynolds, Inc. v. Byrd*, —— U.S. ——, 105 S.Ct. 1238, 84 L.E.2d 158 (1985), defendants moved to amend their prior motions by withdrawing their request for severance and to stay arbitration. They now request that all claims be arbitrated and this litigation stayed until after arbitration. Ross opposes this request.

Defendants seek arbitration based on a clause in the Customer's Agreement between Ross and Bear Stearns. The clause reads in pertinent part as follows:

7. ... Any controversy arising out of or relating to my cash and/or margin accounts to [sic] transactions with you for me or this agreement or the breach thereof shall be settled by arbitration in accordance with the rules, then in effect, of the National Association ... as I may elect. If I do not make such election by registered mail addressed to you at your main office within 5 days after demand by you that I make such election, then you may make such election. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

(Customer's Agreement, Ex. A to Defendants' Motion to Sever and Stay, at 2). Ross signed the Agreement.

The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (the Arbitration Act) governs arbitration agreements made in contracts which concern transactions involving commerce. Under § 2, a written provision in a contract

> to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.* § 2. Section 3 permits the court to stay proceedings pending arbitration if the court is "satisfied that the issue involved ... is referable to arbitration" under an arbitration agreement. *Id.* § 3. If a party to an agreement refuses to arbitrate, the other side may bring an action to compel, and the court after hearing the parties and "being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," shall direct the parties to arbitrate. *Id.* § 4. "If the making of the arbitration agreement or the failure ... to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.*

The Arbitration Act was designed to alleviate traditional judicial hostility to arbitration and to establish a federal policy in favor of arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,* —— U.S. ——, 105 S.Ct. 3346, 87 L.E.2d 444 (1985). By its terms, the Arbitration Act does not provide for discretion. It "mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd,* 105 S.Ct. at 1241 (emphasis in original).

The court first must determine whether the parties agreed to arbitrate the dispute. *Mitsubishi,* 105 S.Ct. at 3354. To do so, it must look to the body of substantive federal law of arbitration. *Moses H. Cone Mem. Hosp. v. Mercury Constr. Co.,* 460 U.S. 1, 22, 103 S.Ct. 927, 940, 74 L.Ed.2d 765

(1983). That law dictates that questions of arbitrability be addressed with healthy regard for the federal policy favoring arbitration; doubts regarding the scope of the agreement should be resolved in favor of arbitration. *Mitsubishi,* 105 S.Ct. at 3354 (citing *Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct at 941–42). The parties' intentions control, but those intentions are generously construed to support arbitrability. *Mitsubishi,* 105 S.Ct. at 3354. The court should be attuned to well grounded claims that "the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Id.*

Initially, the court notes that the agreement covers Ross' other causes of action including those under the 1934 Act, Rule 10b–5, and RICO. The agreement provides that any controversy arising out of the accounts, the agreement, or for breach thereof, will be settled by arbitration. (Customer Agreement, at 2). All of Ross' allegations, including her statutory claims, arise out of the defendants' handling of accounts governed by the agreement. Thus, the agreement covers all of Ross' claims.

Ross argues that her claims should not be arbitrated for several reasons. First, she argues that the claims against Mathis should not be arbitrated because he is not a party to the agreement. Although Mathis did not sign the agreement, the causes of action against him may be arbitrated. Every allegation against him arises out of his handling of Ross' account as a Bear Stearns employee. Her damages are predicated on Mathis' alleged breach of a myriad of state and federal duties concerning her account at Bear Stearns. Ross' assertions based upon her trust in Mathis due to their relationship do not change this fact. Any breach of trust dealt with Mathis' actions regarding Ross' accounts with Bear Stearns.[1] Thus, her case

---

1. In *Moses H. Cone,* the Court noted that plaintiff had disputes with the builder and the architect for indemnification. The latter dispute was

not subject to arbitration because no arbitration agreement existed between plaintiff and the architect. In *Brown v. Dean Witter Reynolds, Inc.,*

against Mathis is based solely on her account, which the arbitration agreement covers.

Ross also argues that no agreement to arbitrate existed,[2] claiming that no contractual relationship is present. She submitted an affidavit stating that Mathis instructed her to sign the agreement, telling her that it was a mere formality and that she did not need to read it. She also alleged that she did not understand or agree that she could not seek an attorney's assistance or file a lawsuit if she had a dispute. Additionally, she claimed that she never agreed to arbitrate, and that she did not read the agreement. Defendants contend that Ross alleges that the entire agreement was procured by fraud, undue influence, and like claims, but not that the arbitration clause was so obtained. Thus, she is not entitled to a jury trial and the claims must go to arbitration.

■■■ A claim of fraud in the inducement of the making of the entire contract can be decided by the arbitrator. Only if fraud is alleged in the making of the specific arbitration clause itself will the court become involved in the determination. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 406, 87 S.Ct. 1801, 1806, 1807, 18 L.Ed.2d 1270 (1967). If a plaintiff claims duress, unconscionability, coercion, or confusion in signing the customer agreement, an arbitrator may decide these issues because they go to the formation of the contract as a whole, rather than to the issue of misrepresentation in the signing of the agreement to arbitrate. *Merrill Lynch, Pierce Fenner & Smith v.*

*Haydu*, 637 F.2d 391, 398 (5th Cir. Unit B 1981). The party resisting arbitration has the burden of showing entitlement to a jury trial. *Id.* at 398 n. 12.

■■ In the instant case, Ross clearly is claiming that the entire agreement was procured by fraud. Although she alleges that she did not read the agreement and did not have knowledge of nor agree to the arbitration clause itself, her complaint is that she was induced into signing the entire agreement. Additionally, at the hearing Ross' attorney admitted that she was denying the validity of the entire agreement, not only the arbitration clause. Thus, *Prima Paints* dictates that the issue of the agreement's existence and validity go to arbitration.[3] *See also Ruby-Collins Inc. v. City of Huntsville*, 748 F.2d 573, 576 (11th Cir.1984); *Ultracashmere Houses, Ltd v. Meyer*, 664 F.2d 1176, 1184 n. 17 (11th Cir.1981).

Ross also contests the arbitrability of her claims under the 1934 Act, Rule 10b–5, and RICO. Notwithstanding the agreement's technical applicability to the causes of action, a question exists as to the arbitrability of 1934 Act and RICO claims. To comprehend the current state of the law, the court will review the judicial treatment of statutory claims arbitrability. In the landmark case of *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), the Supreme Court held that claims arising out of the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.* (the 1933 Act), are nonarbitrable. The Court based this holding primarily on two provisions in the 1933 Act. Section 12

601 F.Supp. 641 (S.D.Fla.1985), the court held that the arbitration clause was broad enough to include disputes arising out of business between plaintiff and other employees who did not sign the agreement.

The instant suit is more similar to the *Brown* case in that the causes of action arose out of the employee defendants' dealings with plaintiff's accounts which the contract covered. In *Cone*, the architect was not employed by the builder and was not covered by the contract.

**2.** Ross originally did not assert that an arbitration agreement was nonexistent, but did so only after defendants filed their motion.

**3.** Ross cited *Par-Knit Mills Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51 (3d Cir.1980) to support her contention. The court in *Par-Knit* held that if any doubt was present as to the existence of an express unequivocal agreement to arbitrate, the court should give the party opposing arbitration all reasonable doubts and should submit the matter to the jury. *Id.* at 54. Of course, *Par-Knit* is not binding on this court. Additionally, the federal "bias" in favor of arbitration expressed in *Moses H. Cone, Byrd,* and *Mitsubishi* indicate that *Par-Knit's* formulation is incorrect.

states that any person who violates the 1933 Act's strictures "shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction." 1933 Act § 12, 15 U.S.C. § 77*l*. Section 14 provides that

> Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

1933 Act, § 14, 15 U.S.C. § 77n.

The combination of these provisions caused the Court to hold 1933 Act claims nonarbitrable. First, § 12 grants a private right of action to one injured by a violation of the 1933 Act. Second, § 14 prohibits a person protected by the 1933 Act from waiving any provision of that Act. A person thus cannot waive his statutory right to sue in a court. 346 U.S. at 434–35, 74 S.Ct. at 186–87. An agreement to arbitrate does just that, and is invalid. *Id.* The Court conceded that the Arbitration Act propounds a strong federal policy in favor of arbitration. *Id.* at 438, 74 S.Ct. at 188. The language of the 1933 Act, and its purpose of protecting securities purchasers, mandated that the Court deny arbitration of 1933 Act claims. *Id.*

Lower federal courts expanded the holding in *Wilko* to encompass complaints brought under the 1934 Act. *See, e.g., Belke v. Merrill Lynch, Pierce Fenner & Smith,* 693 F.2d 1023, 1025 (11th Cir.1982); *Sibley v. Tandy Corp.* 543 F.2d 540, 543 & n. 3 (5th Cir.1976). In *Scherk v. Alberto Culver Co.,* 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), however, the Court questioned *Wilko's* applicability to 1934 Act claims, because its provisions differ from those of the 1933 Act, and because the latter, unlike the former, expressly gives a private right of action. 417 U.S. at 513–14, 94 S.Ct. at 2454–55. Notwithstanding its concerns, the Court did not hold that

*Wilko* was inapplicable in a 1934 Act case. Instead, the Court found that claims under the 1934 Act in an international transaction were arbitrable. *Id.* at 515–20, 94 S.Ct. at 2455–58.

Defendants cite *Byrd* as authority for the arbitrability of 1934 Act claims. Unfortunately, the Court did not decide the issue in *Byrd.* While noting that *Scherk* questioned *Wilko's* applicability to 1934 Act claims, the Court declined to resolve the question because the issue was not properly before it. *Byrd,* 105 S.Ct. at 1240 n. 1. In his concurrence, Justice White noted that this was a question of substantial doubt, *id.* at 1244, and that it remained open, *id.* He stated that the 1933 Act provided for a private right of action, which the 1934 Act did not, although one has been implied by the courts. *Wilko's* solicitude for the federal securities cause of action is not necessarily appropriate when the cause is judicially implied and not statutorily created. Also, the Acts differ; the 1934 Act is narrower and limits actions to federal court. *Id.*

Most recently, the Court dealt with the arbitrability of antitrust claims in an international setting in *Mitsubishi.* The Court noted that statutory claims as a whole are not free from arbitration merely because they are based on statutes. 105 S.Ct. at 3353. Courts must rely on congressional intent expressed in a particular statute to identify claims that are nonarbitrable. Parties should be held to arbitration unless congressional intent is otherwise. *Id.* at 3355.

The preceding discussion makes clear that the trend in Supreme Court decisions is toward arbitrability of an increasing variety of statutory claims. The Court has stressed repeatedly the importance of the Arbitration Act and the favor with which federal policy views arbitration. *Mitsubishi,* 105 S.Ct. at 3354; *Byrd,* 105 S.Ct. at 1242; *see e.g., Moses H. Cone,* 460 U.S. at 24, 103 S.Ct. at 941.[4] Additionally, *Mitsu-*

---

**4.** *But see Barrentine v. Arkansas-Best Freight System Inc.,* 450 U.S. 728, 744–45, 101 S.Ct. 1437, 1446–47, 67 L.Ed.2d 641 (1981) (claims under Fair Labor Standards Act (FLSA) not arbitrable); *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 56–57, 94 S.Ct. 1011, 1023–24, 39

*bishi* requires arbitration of statutory claims unless the statute evinces congressional intent to be exempt from arbitration. *Mitsubishi*, 105 S.Ct. at 3355.

In the instant action, the framework espoused by *Mitsubishi* indicates that 1934 Act claims should be arbitrable. *Mitsubishi* requires the court to conduct a two-step inquiry, first determining whether the parties' agreement to arbitrate reaches statutory issues and if so, whether legal constraints outside the agreement foreclose arbitration. *Id.* The court earlier determined that the agreement to arbitrate covered the statutory claims. A consideration of the second step hinges upon Congress' intent in enacting the 1934 Act. That Act contains a provision forbidding waiver of any right secured therein. 1934 Act § 29(a), 15 U.S.C. § 78cc(a). This language is similar to § 14 in the 1933 Act. Unlike the 1933 Act, the 1934 Act does not provide expressly for a private right of action. *See Byrd*, 105 S.Ct. at 1240 n. 1.

■ This distinction between the statutes is crucial. A party "should be held to [its bargain to arbitrate] unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statu-

tory rights at issue." *Mitsubishi*, 105 S.Ct. at 3355. In the 1933 Act, Congress displayed just such an intent. Waiver of a privilege afforded by the statute, the private right of action, is prohibited. The 1934 Act also disapproves waiver of statutory rights, but the private right of action is a judicial, not statutory, creation. The anti-waiver provision thus does not cover the right of action, and a party is free to waive it. In the instant action, the parties agreed to arbitrate all issues arising out of Ross' margin accounts. She thus waived her right to litigate these matters exclusively in federal court. The 1934 Act claims are arbitrable.[5]

Defendants also urge the court to submit Ross' RICO claims to arbitration. This arbitrability of RICO allegations is an open question in this circuit. *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1361 (11th Cir.1985). Unlike the 1934 Act, RICO grants an explicit private right of action. 18 U.S.C. § 1964(c). Unlike both Acts, RICO does not include a non-waiver provision. Nothing in RICO shows Congress' intent to "preclude a waiver of judicial remedies." *Mitsubishi*, 105 S.Ct.

L.Ed.2d 147 (1974) (Title VII claims not arbitrable). In his dissenting opinion in *Mitsubishi*, Justice Stevens pointed to these cases as examples of the natural distinction between statutory and contractual rights. 105 S.Ct. at 3365–66. He asserted that statutory rights should be non-arbitrable. *Id.* Of course, the majority in *Mitsubishi* did not agree.

One distinction between the Court's handling of *Alexander* and *Barrentine* on the one hand and *Mitsubishi* on the other is that the latter dealt with international transactions.

Another difference is that *Barrentine* and *Alexander* concerned not the Arbitration Act but statutes encouraging collective bargaining and arbitration of labor disputes. *Barrentine*, 450 U.S. at 734–35, 101 S.Ct. at 1441–42; *Alexander*, 415 U.S. at 47, 94 S.Ct. at 1019. An arbitration clause in a collective bargaining agreement concerns workers as union members. 450 U.S. at 737, 101 S.Ct. at 1443; 415 U.S. at 51, 94 S.Ct. at 1021. A claim under Title VII and the FLSA devolve on a worker as an individual. 450 U.S. at 739, 101 S.Ct. at 1444; 415 U.S. at 51, 94 S.Ct. at 1021. In *Alexander,* the Court found that Title VII provided for non-judicial review but clearly granted the right to a de novo hearing in

court. 415 U.S. 47–48, 94 S.Ct. at 1019–20. Finally, the Court stressed that Congress placed special emphasis on these statutes. 450 U.S. at 740–41, 101 S.Ct. at 1444–45; 415 U.S. at 51, 94 S.Ct. at 1021. The FLSA protects workers from substandard wages and oppressive hours, 450 U.S. at 739, 101 S.Ct. at 1444; Title VII vindicates workplace deprivations of constitutionally protected rights, 415 U.S. at 51, 94 S.Ct. at 1021. Both statutes override the labor law provisions in question.

The cases noted that a labor law arbitrator might be unfamiliar with FLSA and Title VII law. 450 U.S. at 743–44, 101 S.Ct. at 1446–47; 415 U.S. at 57, 94 S.Ct. at 1024. This is one argument against arbitrating statutory securities claims. Whether the distinctions set forth *supra* will remain viable after *Mitsubishi* must be decided in future cases.

**5.** The discussion of arbitrability of 1934 Act claims includes violations of Rule 10b–5. The Court in *Wilko* found that the 1933 Act provided a wide variety of fora in which a litigant could sue. 346 U.S. at 435, 74 S.Ct. at 186. The 1934 Act provides access only to federal court. *Byrd*, 105 S.Ct. at 1244 (White, J., concurring) (citing 15 U.S.C. § 78aa).

at 3355. Thus, RICO claims may be arbitrated.[6]

In holding that 1934 Act and RICO claims are arbitrable, the court is aware of public policy considerations implicit in both statutes. The 1934 Act's purpose is to provide a healthy environment for the securities exchange market. Its enforcement is necessary to protect the market and the public. RICO was enacted to prevent and reverse infiltration of legitimate business by organized crime elements. *S.A. Mineracao da Trindade-Samitri v. Utah Int'l, Inc.*, 576 F.Supp. 566 (S.D.N.Y.1983), *aff'd* 745 F.2d 190 (2d Cir.1984).[7]

■■■ Obviously, these are important policies. The policies espoused by the Arbitration Act, however, also are important. The trend of Supreme Court cases has been stressing the significance of the Arbitration Act, allowing it to prevail over other policy considerations. Finally, the Court in *Mitsubishi* has indicated the paramount importance of the Arbitration Act by requiring any other statute claiming to override it to clearly indicate that intent. *Mitsubishi*, 105 S.Ct. at 3353–55. These factors demonstrate that absent contrary congressional intent, statutory claims are arbitrable. The court finds that all claims are arbitrable.[8] The Arbitration Act thus mandates that this court order the parties to proceed to arbitration. Defendants' motion to compel arbitration and stay this litigation is granted.[9]

---

**6.** Congress may have omitted a RICO nonwaiver provision because in a typical scenario it would be unnecessary. For example, a shopkeeper is approached by an organized crime henchman for protection money. Any "contract" between the two undoubtedly would not contain an agreement to arbitrate. In the instant case, the parties signed a contract with such a clause. The RICO claims arose under the contract and are covered by the agreement. Congress did not provide that such a waiver is void. Perhaps with the increased use of RICO outside the traditional organized crime situations and in "normal" contractual relationships, a nonwaiver provision would be warranted. Until Congress so finds, however, the court will not imply one.

**7.** The United States Court of Appeals for the Second Circuit affirmed the decision in *S.A. Mineracao.* The court did not pass upon the arbitrability of RICO claims. *See* 579 F.Supp. 1049 (S.D.N.Y.1984) (certification of the appeal).

Both the district and appellate decisions were rendered prior to *Byrd* and *Mitsubishi.*

**8.** Ross does not allege that her state law claims are non-arbitrable, but that no contract exists. Thus, no dispute exists concerning the arbitrability of the state law contentions.

**9.** Parties to a contract are free to exclude statutory claims from arbitration. *Mitsubishi*, 105 S.Ct. at 3355. The parties of course might not know which statutory claims they may have later. Until Congress explicitly states its intent to bar arbitration in certain statutory litigation, the court must adhere to the *Mitsubishi* ruling and require arbitration.